FILED
CLERK, U.S. DISTRICT COURT
10/30/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DD___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>NITA ALMUETE PADDIT PALMA,<br>　aka "Nita Catbagan," and<br>PERCY DEAN ABRAMS,<br><br>　　　　Defendants. | CR   2:20-cr-00536-DMG<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1347(a)(2): Health Care Fraud; 42 U.S.C. § 1320a-7b(b)(2)(A): Paying Illegal Remunerations for Health Care Referrals; 42 U.S.C. § 1320a-7b(b)(1)(A): Receiving Illegal Remunerations for Health Care Referrals; 18 U.S.C. § 982(a)(7): Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH TWELVE

[18 U.S.C. §§ 1347(a)(2), 2(b)]

[Defendant PALMA]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Magnolia Gardens Hospice, Inc. ("Magnolia"), was a hospice care provider located in Glendale, California, within the Central District of California.

2.   Defendant NITA ALMUETE PADDIT PALMA, also known as "Nita

Catbagan," was a resident of Glendale, California, within the Central District of California. Defendant PALMA purchased Magnolia from its prior owner on or about July 22, 2015. Defendant PALMA owned and operated Magnolia from in or about July 2015 to at least in or about October 2017.

3. Co-Owner 1 was defendant PALMA's husband and co-owned and co-operated Magnolia with defendant PALMA.

4. Defendant PALMA and Co-Owner 1 maintained joint control over Magnolia's bank account at Bank of America (the "Magnolia Bank Account").

5. Percy Dean Abrams was a resident of Lakewood, California, within the Central District of California. Abrams was a marketer who recruited patients for Magnolia.

The Medicare Program

6. Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

7. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each Medicare beneficiary was given a Health Identification Card Number unique to that beneficiary.

8. Hospices, physicians, and other health care providers who provided services to beneficiaries that were reimbursed by Medicare were referred to as "providers."

9.  To become eligible to participate in Medicare, Medicare required prospective providers to be licensed by a state or local agency.  After obtaining the applicable license, Medicare required prospective hospice providers to submit an application in which the prospective provider agreed to: (a) comply with all Medicare-related laws and regulations, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which prohibits the offering, paying, soliciting, or receiving of any remuneration for the referral of Medicare beneficiaries; and (b) not submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.  If Medicare approved the application, Medicare assigned the provider an identifying number, which enabled the provider to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

10.  The United States Department of Health and Human Services ("HHS") had the authority to exclude individuals from being able to participate in the Medicare program.  The effect of an exclusion was that no payment would be made by Medicare for any items or services furnished, ordered, or prescribed by an excluded individual or entity.  This payment prohibition applied to the excluded person, including anyone who employed or contracted with the excluded person and any hospital or other provider for which the excluded person provided services.  The exclusion applied regardless of who submitted the claims and applied to all administrative and management services furnished by the excluded person.  An individual excluded was ineligible to participate in the Medicare program unless the individual was reinstated by HHS.

11. To qualify for reimbursement for hospice services, Medicare required: (1) a physician to certify that the beneficiary was terminally ill, meaning a life expectancy of six months or less if the beneficiary's illness ran its normal course; and (2) the beneficiary to sign an election form statement choosing hospice care instead of other Medicare benefits. Hospice services reimbursed by Medicare were palliative in nature and included, but were not limited to, medications to manage pain symptoms, necessary medical equipment, and bereavement services to surviving family members. Once a beneficiary chose hospice care, Medicare would not cover treatment intended to cure the beneficiary's terminal illness. The election form was required to include an acknowledgement that the beneficiary had been given a full understanding of hospice care, including the palliative rather than curative nature of treatment, and an acknowledgement that the beneficiary understood that certain Medicare services were waived by the election.

12. If the beneficiary had a primary care physician, Medicare required the PCP and a physician at a hospice to certify in writing that the beneficiary was terminally ill.

13. Medicare was divided into different program "parts": Part A, Part B, Part C, and Part D. Medicare covered hospice services for those beneficiaries who were eligible for Medicare Part A (hospital-related services). When a Medicare beneficiary elected hospice coverage, the beneficiary waived all rights to Medicare Part B (outpatient physician services and procedures) coverage of services to treat or reverse the beneficiary's terminal illness while the beneficiary was on hospice.

14. A beneficiary could elect to receive hospice benefits for two periods of 90 days and, thereafter, additional service for periods of 60 days per period.

15. For the beneficiary to continue to receive hospice benefits after the second 90-day period, Medicare required that a physician re-certify that the beneficiary was terminally ill and include clinic findings or other documentation supporting the diagnosis of terminal illness. For re-certifications, Medicare required a hospice physician or nurse practitioner to meet with the beneficiary in person and conduct a face-to-face evaluation before signing a certification of terminal illness.

16. Most providers, including Magnolia, submitted their claims electronically pursuant to an agreement with Medicare that they would submit claims that were accurate, complete, and truthful.

17. Magnolia received payments on Medicare claims via electronic funds transfer to the Magnolia Bank Account.

Defendant PALMA's Exclusion from the Medicare Program

18. On or about October 31, 1997, HHS notified defendant PALMA by letter that she was excluded from participating in the Medicare program effective on or about November 20, 1997.

19. In or around 2011, HHS notified defendant PALMA by letter of an additional basis for her on-going exclusion from participating in the Medicare program.

20. Defendant PALMA's exclusion was never terminated and she was never reinstated as a participant in the Medicare program.

B.   THE SCHEME TO DEFRAUD

21. Beginning no later than in or about July 2015, and continuing through at least in or about May 2017, in Los Angeles

5

County, within the Central District of California, and elsewhere, defendant PALMA, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, attempted to execute, and willfully caused to be executed a scheme and artifice to obtain money from Medicare by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C. MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

22. The fraudulent scheme operated, in substance, as follows:

   a. In order to circumvent her exclusion from the Medicare program and obtain payments from Medicare for hospice services provided by Magnolia, defendant PALMA concealed her ownership of Magnolia and her role in operating it. Defendant PALMA did so by directing, together with Co-Owner 1, a close family member ("Magnolia Nominee Owner") to submit a Medicare provider application falsely listing the Magnolia Nominee Owner as the Chief Executive Officer and 100% owner of Magnolia. In fact, as defendant PALMA knew, the Magnolia Nominee Owner was not Magnolia's Chief Executive Officer and did not own any interest in Magnolia. To the contrary, as defendant PALMA knew, Magnolia was wholly owned and controlled by defendant PALMA and Co-Owner 1.

   b. In order to increase Magnolia's billings to Medicare and the payments it received as a result of those billings, defendant PALMA paid recruiters, also known as "marketers" and "cappers," including, but not limited to, Abrams, illegal kickbacks in exchange for referring beneficiaries to Magnolia for hospice services, regardless of whether the beneficiaries were eligible for such

services. The amount of the kickbacks varied, but in some instances reached approximately $1,000 per beneficiary per month the beneficiary remained on hospice care with Magnolia. Defendant PALMA concealed these kickbacks from Medicare, because Medicare would not have paid any claims related to beneficiaries who were referred to Magnolia because Magnolia had paid marketers illegal kickbacks for the referrals.

    c. Defendant PALMA paid the kickbacks to the marketers, including Abrams, in cash as well as with checks that she drew on the Magnolia Bank Account.

    d. Defendant PALMA caused Magnolia to submit false and fraudulent claims to Medicare for hospice services, including claims for services that defendant PALMA knew were not medically necessary. Specifically, at the time she caused certain claims to be submitted, defendant PALMA knew the beneficiaries named in the claims were not eligible for hospice care.

  23. Between in or about September 2015 and in or about May 2017, defendant PALMA submitted and caused the submission of approximately $3.2 million in claims to Medicare for hospice services, including fraudulent claims, resulting in Medicare payments of approximately $2.5 million.

D. EXECUTIONS OF THE FRAUDULENT SCHEME

  24. On or about the dates set forth below, within the Central District of California, and elsewhere, defendant PALMA, together with others known and unknown to the Grand Jury, knowingly and willfully executed, attempted to execute, and willfully caused the execution of the fraudulent scheme described above by submitting and causing to be

submitted to Medicare the following false and fraudulent claims for payment for hospice services:

| COUNT | CLAIM NUMBER | CLAIM SUBMISSION DATE | AMOUNT BILLED | BENEFICIARY |
|---|---|---|---|---|
| ONE | 21530601010207CAR | 11/2/15 | $2,430.40 | M.D. |
| TWO | 21530601024307CAR | 11/2/15 | $5,963.20 | W.M. |
| THREE | 21530601006907CAR | 11/2/15 | $5,229.90 | S.H. |
| FOUR | 21530601010007CAR | 11/2/15 | $5,692.60 | D.J.C. |
| FIVE | 21530601009307CAR | 11/2/15 | $2,283.70 | J.P.G. |
| SIX | 21530601009907CAR | 11/2/15 | $1,283.30 | E.W. |
| SEVEN | 21533500530407CAR | 12/1/15 | $5,945.50 | T.N. |
| EIGHT | 21603200687007CAR | 2/1/16 | $417.70 | S.H. |
| NINE | 21603300664307CAR | 2/2/16 | $6,409.72 | A.H |
| TEN | 21609701048207CAR | 4/6/16 | $5,641.22 | A.H. |
| ELEVEN | 21620800133304CAR | 7/28/16 | $6,780.00 | W.M. |
| TWELVE | 21621800966807CAR | 9/12/16 | $6,716.12 | T.N. |

COUNTS THIRTEEN THROUGH TWENTY-EIGHT

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

[Defendant PALMA]

25. The Grand Jury realleges paragraphs 1 through 17 and 22 of this Indictment here.

26. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant PALMA, together with others known and unknown to the Grand Jury, knowingly and willfully offered and paid, and caused to be offered and paid, remuneration, namely, the following amounts payable by checks drawn on the Magnolia Bank Account, which constituted kickbacks to marketers for referring patients to Magnolia for hospice services, for which payment could be made in whole and in part under a Federal health care program, namely, Medicare:

| COUNT | DATE ON CHECK | CHECK NUMBER | APPROXIMATE AMOUNT |
|---|---|---|---|
| THIRTEEN | 11/5/15 | 1275 | $6,000.00 |
| FOURTEEN | 11/5/15 | 1276 | $5,000.00 |
| FIFTEEN | 11/5/15 | 1278 | $4,000.00 |
| SIXTEEN | 11/9/15 | 1299 | $1,000.00 |
| SEVENTEEN | 11/20/15 | 1307 | $6,000.00 |
| EIGHTEEN | 11/20/15 | 1308 | $5,000.00 |
| NINETEEN | 11/20/15 | 1309 | $7,000.00 |
| TWENTY | 11/20/15 | 1312 | $5,000.00 |
| TWENTY-ONE | 11/20/15 | 1313 | $4,000.00 |
| TWENTY-TWO | 12/5/15 | 1396 | $4,000.00 |
| TWENTY-THREE | 2/5/16 | 1491 | $2,019.50 |
| TWENTY-FOUR | 2/5/16 | 1492 | $3,473.87 |
| TWENTY-FIVE | 2/19/16 | 1504 | $4,000.00 |
| TWENTY-SIX | 2/19/16 | 1507 | $3,109.90 |
| TWENTY-SEVEN | 3/4/16 | 1573 | $2,019.50 |
| TWENTY-EIGHT | 3/18/16 | 1592 | $1,452.78 |

COUNTS TWENTY-NINE THROUGH THIRTY-FOUR

[42 U.S.C. § 1320a-7b(b)(1)(A)]

[Defendant ABRAMS]

27. The Grand Jury realleges paragraphs 1 through 17 and 22 of this Indictment here.

28. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant PERCY DEAN ABRAMS knowingly and willfully solicited and received remuneration, namely, the following amounts payable by checks drawn on the Magnolia Bank Account, which constituted kickbacks for referring Medicare beneficiaries to Magnolia for hospice services, for which payment could be made in whole and in part under a Federal health care program, namely, Medicare:

| COUNT | DATE ON CHECK | CHECK NUMBER | APPROXIMATE AMOUNT |
|---|---|---|---|
| TWENTY-NINE | 11/5/15 | 1275 | $6,000.00 |
| THIRTY | 11/20/15 | 1307 | $6,000.00 |
| THIRTY-ONE | 12/5/15 | 1396 | $4,000.00 |
| THIRTY-TWO | 2/5/16 | 1491 | $2,019.50 |
| THIRTY-THREE | 3/4/16 | 1573 | $2,019.50 |
| THIRTY-FOUR | 3/18/16 | 1592 | $1,452.78 |

FORFEITURE ALLEGATION

[18 U.S.C. § 982(a)(7)]

29.  Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7), in the event of defendant NITA ALMUETE PADDIT PALMA's conviction of the offenses set forth in any of Counts One through Twelve of this Indictment.

30.  Defendant PALMA, if so convicted, shall forfeit to the United States of America the following:

   (a)  All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

   (b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

//
//
//
//
//
//
//
//
//
//
//

1        31.   Pursuant to Title 21, United States Code, Section 853(p),
2   as incorporated by Title 18, United States Code, Section 982(b),
3   defendant PALMA, if so convicted, shall forfeit substitute property,
4   up to the total value of the property described in the preceding
5   paragraph if, as a result of any act or omission of defendant PALMA,
6   the property described in the preceding paragraph, or any portion
7   thereof (a) cannot be located upon the exercise of due diligence;
8   (b) has been transferred, sold to or deposited with a third party;
9   (c) has been placed beyond the jurisdiction of the Court; (d) has
10  been substantially diminished in value; or (e) has been commingled
11  with other property that cannot be divided without difficulty.

                                         A TRUE BILL


                                         _____/S/_____
                                         Foreperson

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

POONAM G. KUMAR
Assistant United States Attorney
Deputy Chief, Major Frauds Section

ROGER A. HSIEH
Assistant United States Attorney
Major Frauds Section